IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MICHAEL APODACA, et al.,

      Plaintiffs,

v.                                                                                  CIV No. 01-639 LH/LFG

PUBLIC SERVICE COMPANY
OF NEW MEXICO,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on PNM's Motion for Summary Judgment (Docket No. 40). The Court, having considered the pleadings of the parties and relevant caselaw, concludes that the motion shall be **granted in part and denied in part.** Specifically, Counts II and III of Plaintiffs' Complaint, claims for discrimination based on race and sex respectively, are hereby **dismissed**. All other claims shall remain in the lawsuit.

Plaintiffs filed this lawsuit alleging violations of the Employee Retirement Income Security Act[1] ("ERISA") and discrimination based on race, sex and age. In their response to PNM's motion, Plaintiffs state that the motion is premature. They seek to incorporate a request for additional discovery pursuant to FED.R.CIV.P. 56(f). On May 7, 2002, Magistrate Judge Garcia denied this

---

[1] 29 U.S.C. § 1001, *et seq.*

1

request for additional discovery (Docket No. 48). His order notes that in its reply brief, PNM states that Plaintiffs were wrong in their representation that PNM had not responded to discovery requests and that in fact PNM had responded to these requests on January 22, 2002. As noted by Judge Garcia, Plaintiffs "now sheepishly admit their error and acknowledge that they received PNM's discovery, but 'overlooked' the responses." (*see* Mem. and Order at 2). Judge Garcia noted that discovery closed in this case on March 15, 2002, and that the pending motion for summary judgment is now ripe for determination. (*Id*. at 3). Given this procedural history, this Court specifically rules that PNM's motion is not premature, and that it shall be decided based upon the record before this Court as contained in the three main briefs submitted as well as in Plaintiffs' Supplemental Response (Docket No. 43).

**I. Summary Judgment Standards**

Summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).

Once the moving party has properly submitted its motion for summary judgment, the non-moving party may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial, relying upon the types of evidentiary materials contemplated by Rule 56. *John Hancock Mut. Life Ins. Co. v. Weisman*, 27 F.3d 500, 503 (10th Cir. 1994). The evidence and all reasonable inferences derived therefrom shall be viewed in the light most favorable to the nonmoving party. *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1108 (10th Cir. 2001).

Summary judgment is appropriate if the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 251-52 (1986)(stating that relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law).

## II. ERISA Claims

### A. Facts

The parties stipulated to the following facts in their Pretrial Order (Docket No. 49). In September 1999, Public Service Company of New Mexico ("PNM") merged its Gas and Electric Division Meter Departments for small commercial and residential customers. Specifically, PNM consolidated the Meter Service Technician ("MST") classification (electric) with the Utility Work classification (gas) in Albuquerque (hereafter "Consolidation"). The Consolidation affected fourteen (14) of the MSTs, all of whom were members of the International Brotherhood of Electrical Workers Local Union ("IBEW union"). In March 2000, PNM notified the IBEW union of its plans to consolidate. PNM engaged in negotiations with the union regarding the effects on union members. These negotiations resulted in PNM offering the MSTs two options: (1) transfer to Utility Worker position with a pay cut from $19.85 per hour to $10.63 per hour, and a one-time lump sum payment in the amount of $12,000, representing the difference between the prior hourly rate and the new hourly rate for a period of 1,300 hours; or (2) accept voluntary layoff and receive the severance package as provided for in the collective bargaining agreement.

Seven MSTs[2] accepted Utility Worker positions and the lump sum payment. Seven MSTs[3] elected to take the voluntary layoff and receive the severance package.

On June 5, 2000, the union filed a grievance on behalf of all MSTs affected by the Consolidation. The grievance settled on August 18, 2000. Under the terms of the settlement, the transferred MSTs were to be reinstated to MST positions and the MSTs who accepted voluntary layoff were to be offered re-employment.

Before the Consolidation, all MSTs had been covered by PNM's defined benefit pension plan. That plan limited the accrual of credited service as follows: "The Credited Service Termination Date of a Participant who ceased to be an Employee on or after January 1, 1998, is the date the Participant ceased to be an Employee, even if the Participant is rehired after that date." The Guide to PNM Benefits states: "If you were a plan participant before January 1, 1998, and you terminate your employment after January 1, 1998, and are later rehired, you will not be eligible to accrue additional credited service in the Retirement Plan after the date you are rehired."

In addition to these stipulated facts, PNM contends that the following facts are undisputed. Plaintiffs Harper, Gonzales-Dunbar, and Edwards, who had been laid off, accepted offers of re-employment. These Plaintiffs were permitted to keep the severance benefits. These Plaintiffs were not given credit for retirement purposes for the four months that they were unemployed. Plaintiffs dispute none of these asserted facts, which the Court now accepts as true.

Plaintiffs Apodaca, Gonzales, and Marquez, who were transferred to other positions, accepted

---

[2] These seven were Plaintiffs Apodaca, Gonzales and Marquez, and four non-Plaintiffs.

[3] These seven were Plaintiffs Fleming, Sandoval, Edwards, Gonzales-Dunbar, Harper, Engert, and Willden.

offers of reinstatement to MST positions. They were permitted to keep the $12,000 lump sum payments and had no break in service. Plaintiffs dispute none of these asserted facts, which the Court now accepts as true. PNM also asserts that these three Plaintiffs experienced no effect on their retirement benefits, however Plaintiffs dispute this assertion, referring the Court to Defendant's Exhibit B-4 and Plaintiffs' Exhibit E, which raise a factual question on this issue only. Exhibit B-4, the August 18, 2000 Grievance Settlement, states that this particular group of Plaintiffs "shall not accrue any additional pension benefits as provided for under the Company's defined benefit pension plan, since this is not permitted by that plan according to PNM's representation." This appears to be contradicted by Exhibit E, which is a February 1, 2002 letter from PNM to an IBEW Union manager, Andy Palmer. Exhibit E states that this same group of Plaintiffs "suffered no reduction in pension benefits pursuant to their transfer to the Utility Worker classification."

Plaintiffs Engert, Fleming, Willden and Sandoval, who had been laid off, either did not accept re-employment or were not informed of the Settlement Agreement and its terms.

### B. Legal Analysis

Each Plaintiff brings an ERISA claim against PNM in Count I of the Complaint. Specifically, each alleges that PNM's "termination of Plaintiffs was pretextual and purposefully interfered with Plaintiffs' rights to continued health benefits and the expectancy of retirement and pension benefits, thereby causing Plaintiffs to lose substantial benefits and other fringe benefits of employment." (Plaintiffs' Complaint at ¶ 50). Plaintiffs also allege that PNM "wished to eliminate older workers who were covered by the more expansive Retirement Plan or who are more likely to participate more fully in the 401(K) Plan, and planned the elimination of Meter Service Technician positions on that basis." (*Id.* at ¶ 39).

5

It is unlawful under 29 U.S.C. §1140 ("Section 510") of ERISA to "discharge, fine, suspend, expel, discipline, or discriminate against a participant . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ." Congress enacted § 510 primarily to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *Gavalik v. Continental Can Co.*, 812 F.2d 834, 851 (3rd Cir. 1987). This section prohibits interference with present pension benefits and also protects against interference with future entitlement to receive the same. *See Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.,* 520 U.S. 510 (1997); *see Garratt v. Walker*, 164 F.3d 1249 (10th Cir. 1998). To establish a claim, a plaintiff must demonstrate that the employer had the specific intent to interfere with the employee's pension benefits. *See Winkel v. Kennecott Holdings Corporation*, 2001 WL 23163 (10th Cir. Jan.10, 2001)(*unpublished*). The employee is not required to show that the employer's sole motivation was to interfere with employee benefits, s/he need only show that it was a motivating factor. *Garratt v. Walker*, 164 F.3d at 1256.

In most cases, as noted by the *Gavalik* court, proof of specific intent to discriminate, to interfere with the attainment of pension eligibility, will not be demonstrated by "smoking gun" evidence. *Gavalik v. Continental Can Co.,* 812 F.2d at 852. As a result, the evidentiary burden in these cases may also be satisfied by the introduction of circumstantial evidence. *See Stone v. Autoliv ASP, Inc*., 210 F.3d 1132, 1136 (10th Cir. 2000)(a plaintiff can prove discrimination by either direct or circumstantial evidence.) Because direct evidence of discriminatory motive is usually unavailable or difficult to acquire, courts have developed formulas that rely on presumptions and shifting burdens that enable the trial judge to sift through the evidence in an orderly fashion to determine the ultimate question in the case – whether or not the defendant intentionally discriminated against the plaintiff.

6

*See Dillon v. Coles,* 746 F.2d 998, 1003 (3d Cir. 1984).

As in the context of employment discrimination claims under Title VII, employees alleging discrimination under ERISA bear the burden of making out a *prima facie* case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981).

Once plaintiff establishes a *prima facie* case of discrimination, this creates a presumption of discriminatory intent. The burden then shifts to the defendant who must articulate a legitimate, nondiscriminatory reason for its conduct. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). The defendant's burden at the second stage of the *McDonnell Douglas* analysis is one of production, *not* one of persuasion. *See id.*

Once the defendant has asserted a facially nondiscriminatory reason for its actions, the plaintiff may still resist summary judgment, either by presenting evidence that the reason is pretextual, *i.e.*, unworthy of belief, or by otherwise introducing evidence of a discriminatory motive. *Stone v. Autoliv ASP, Inc.*, 210 F.3d at 1137. Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). Thus, under the *McDonnell Douglas* framework, the burden of production shifts from plaintiff to defendant and back to plaintiff. The plaintiff, however, bears the ultimate burden of proving that the defendant's discriminatory actions were intentional. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. at 256.

Here, Plaintiffs rely on "inferences" of discrimination, i.e., circumstantial proof of PNM's

intent. In support of an inference of discrimination, Plaintiffs cite the Court to the following facts. To be vested in the PNM retirement plan required 20 years of service.[4] Six of the ten Plaintiffs were fully vested in 2000; the other four lacked only a few years. (PNM Answer to Interrog. No. 13). All six of the vested employees chose the "voluntary layoff" option (*Id*.). The replacement workers who were substituted for the Plaintiffs who left PNM's employ did not receive fringe or retirement benefits (*Id*.).

As noted above, Plaintiffs alleged in their Complaint that their "termination" was purposeful interference by PNM of pension, health and retirement benefits (Complaint ¶ 50), and that PNM eliminated MST positions in order to eliminate older workers covered by a more expansive retirement plan or more likely to participate in a 401(k) Plan. These allegations involve more than an incidental loss of benefits as a result of termination. *See Titsch v. Reliance Group, Inc.*, 548 F.Supp. 983, 985 (S.D.N.Y. 1982), *cited in Gavalik v. Continental Can Co.,* 812 F.2d at 851.

PNM disputes that any of the Plaintiffs was "terminated". Despite their use of termination language in the Complaint, I conclude that adverse employment action by PNM is what Plaintiffs must show in their *prima facie* case. *See generally, Garrett v. Walker*, 164 F.3d at 1255 (noting that § 510 proscribes changes in employment status based upon benefit motivations). As noted above, it is undisputed that the Plaintiffs who were laid off were not given credit for retirement purposes. They actually became ineligible to participate in the pension plan upon being rehired. (Aff. of Robert Curtis, ¶ 28). The group of Plaintiffs who were transferred from, and then reinstated to, MST

---

[4]Plaintiffs made this averment in Paragraph 37 of the Complaint. This paragraph states that employees with 20 years or more of service were covered by the PNM Employee Retirement Plan. It its Amended Answer, PNM did not specifically deny this averment, but rather denied the allegation, stating that the Retirement Plan speaks for itself. Given PNM's failure to fairly meet the substance of the averment, the Court will accept this assertion as true, for purposes of this motion. *See* FED.R.CIV.P. 8(b).

8

positions may have experienced some effect on their retirement benefits.[5] The third group, which included Plaintiffs Engert, Fleming, Willden and Sandoval, was laid off and did not return to PNM employment. A trier of fact could find that a motivating factor behind PNM's actions was to discriminate in its favor and against Plaintiffs in order to save the cost of paying retirement benefits. In other words, a trier of fact could conclude that PNM interfered with the attainment of some of Plaintiffs' retirement benefits to which they may have been entitled. Plaintiffs have adduced sufficient evidence to create a genuine issue of fact on the issue of whether PNM's actions were taken with specific intent to interfere with their ERISA benefits. For these reasons, I conclude that Plaintiffs have established a *prima facie* case, creating a presumption of discriminatory intent.

It thus becomes incumbent upon PNM to articulate a legitimate, nondiscriminatory reason for its conduct. Relying partially on Exhibits A and B for its factual basis, PNM contends that the purpose of the Consolidation was to make its operations more efficient and cost-effective (PNM's Statement of Facts, 1-3; 36-39). As noted by PNM, its burden is that of production, not persuasion, and the truthfulness of its proffered explanation is assumed. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993). PNM has articulated what it asserts to be a legitimate business reason for its actions – that it took these actions so that its operations would be more efficient and cost-effective. A factual basis exists in the record for this explanation.

Thus, the issue now becomes whether Plaintiffs have adduced sufficient evidence to create a genuine issue of fact as to whether PNM's purported reasons were actually a pretext for discrimination, in other words, whether in fact PNM had a specific intent to interfere with Plaintiffs'

---

[5] As above-noted this is unclear from the record before the Court, however the Court is unable to conclude that Plaintiffs did *not* experience some detrimental effect.

ERISA rights.

Plaintiffs argue that PNM's stated business reason is rebutted by its own conduct, specifically when it restored the MST wage rate and offered to take the severed employees back a few months later, letting them keep their severance pay. Plaintiffs argue that this is not cost-effective, whereas the elimination of six of the most highly vested employees in the retirement plan was cost-effective, yet illegal under § 510. I conclude that the record contains evidence from which a factfinder could reasonably find that PNM conceived and implemented this restructuring of its employees for the specific purpose of interfering with Plaintiffs' ERISA rights. Under the circumstances revealed by the instant record, I conclude that a factfinder could find that PNM's asserted business reason is a pretext, and that PNM did have a specific intent to interfere with Plaintiffs' pension benefits, which would violate § 510.

For these reasons, the Court denies PNM's motion for summary judgment on the issue of potential ERISA violations.

**III. Age Discrimination Claims**

Plaintiffs Harper, Willden, Engert, Edwards, Sandoval, Apodaca, Marquez[6], and Fleming alleged claims of age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"). The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or

---

[6] It is noted that PNM seeks immediate dismissal of the race and age discrimination claims of Plaintiff Marquez on the ground that he failed to file appropriate charges with the Equal Employment Opportunity Commission ("EEOC") or the New Mexico Human Rights Division ("HRD"). In this Opinion, this Court dismisses the face claims of all Plaintiffs. Insofar as the age discrimination claim is concerned however, the Court will allow Marquez to "piggyback" on the EEOC complaint filed by the other Plaintiffs who are similarly situated. *See Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d at 1110.

privileges of employment, because of such individual's age . . . . " 29 U.S.C. § 623(a)(1). Plaintiffs allege that PNM "targeted older workers . . . for the alleged reduction in force." (Plaintiffs' Complaint at ¶ 60). Plaintiffs also allege that "PNM targeted older workers, and acted to interfere with employee pension rights and the terminations were forced retirements of Plaintiffs. (*Id*. at ¶ 43). Finally, Plaintiffs allege that PNM used "temporary employees" to perform the MST functions in the summer of 2000 and that the "temporary employees were all significantly younger than Plaintiffs . . . ". (*Id*. at ¶ 40).

As with their ERISA claim, Plaintiffs' age discrimination claims must be analyzed under the *McDonnell Douglas* framework. Plaintiffs' first step in proving discrimination under the ADEA is to supply evidence proving a prima facie case of age discrimination by a preponderance of the evidence. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). To prove a prima facie case of age discrimination, Plaintiffs must show that: (1) they were each a member of a protected class (age 40-70); (2) they were adversely affected by the Defendant's employment decision; (3) they were qualified for the position; and (4) a younger person was given the desired position. *Jones v. Unisys Corp.*, 54 F.3d 624, 630 (10th Cir. 1995).[7]

According to PNM's Answers to Interrogatory No. 13, all eight of these Plaintiffs were older than 40 at the time of PNM's alleged actions. Accordingly, the Court concludes that these Plaintiffs

---

[7]In its brief, PNM argues that there was no "reduction in force". The Court notes that, in reduction in force cases, because a plaintiff is not always replaced with another employee, the Tenth Circuit modified the *McDonnell Douglas* burden shifting scheme so that a plaintiff may demonstrate the fourth element by producing "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Branson v. Price River Coal Co.*, 853 F.2d 768, 770 (10th Cir. 1988). The fourth element may also be shown by circumstantial evidence that a plaintiff was treated less favorably than younger employees. *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1454 (10th Cir. 1994). The Court notes that its conclusion on these ADEA claims would be the same under either standard, hence it is unnecessary to decide whether or not this situation should be characterized as a "reduction in force".

have established that they were members of a protected class.

As to the second prong, as noted above in the ERISA analysis, the Court has concluded that Plaintiffs were adversely affected by PNM's employment decisions. Thirdly, there seems to be no dispute in the record as to Plaintiffs' qualification for the positions involved here. The real crux of the matter here is whether or not PNM intended to discriminate, based on age, in taking the actions it did.

Plaintiffs argue that their ERISA and ADEA claims are inextricably intertwined. The Court agrees with the logic of their argument: this is not a case where ERISA discrimination can be age-neutral.[8] The plan at issue required 20 years to be vested and all Plaintiffs in this case who achieved full vesting were over 42. To target vested employees was to target older employees. The Court has concluded that there is a factual question on the issue of intentional interference with Plaintiffs' pension benefits. Under that same rationale and *McDonnell Douglas* analysis, the Court concludes there is a factual question under the ADEA as well.

**IV.  Gender Discrimination**

Plaintiffs Edwards, Gonzales-Dunbar and Fleming claim that they were discriminated against on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 and in violation of 42 U.S.C. § 1981. Specifically, these Plaintiffs allege that acts of discrimination included termination based on sex (Complaint ¶ 56), and that elimination of the MSTs in Albuquerque unfairly targeted women (*Id*. at ¶ 57). Plaintiffs allege that in May of 2000, there were four women holding this

---

[8]An example of an age-neutral case would be where vesting could occur in a short time and fairly young workers would generally be affected.

position in New Mexico and that all four were either terminated or forced into early retirement. (*Id*).

### A. Disparate Treatment

Disparate treatment claims involve "the most easily understood type of discrimination" in which an employer treats an individual less favorably than others because of her protected status. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977), *quoted in Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1315 (10th Cir. 1999). Because disparate treatment is a form of intentional discrimination, the plaintiff must prove that his or her employer acted with a discriminatory intent or motive. *See Faulkner v. Super Valu Stores, Inc*., 3 F.3d 1419, 1424 (10th Cir. 1993). Once again, the basic allocation of burdens is as set forth in *McDonnell Douglas.* To prove a *prima facie* case, Plaintiffs here must show: (1) that they are a member of a class protected by the statute; (2) that they suffered an adverse employment action; (3) that they were qualified for the position at issue; and, (4) that they were treated less favorably than others not in the protected class. *Sanchez v. Denver Public Schools*, 164 F.3d 527, 531 (10th Cir. 1998). If they establish a *prima facie* case, the burden shifts to PNM to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. If PNM is able to do this, the burden reverts to Plaintiffs who must show that PNM's proffered reason was a pretext for discrimination. *McDonnell Douglas v. Green*, 411 U.S. at 792.

The Court concludes that Plaintiffs have met the first three prongs of their burden but is troubled by a failure of proof as to the fourth prong. Specifically, Plaintiffs must show that they, as women, were treated less favorably than the male MSTs.

The Court has diligently searched the weak record on this issue. PNM's Answer to

13

Interrogatory No. 13 shows that of 14 MSTs (presumably in Albuquerque), four were women and ten were men. According to the uncontroverted Affidavit of Robert F. Curtis, PNM Manager of Labor Relations, each of these 14 MSTs were given identical options, regardless of age, gender, race, seniority or status with respect to the pension plan, both before and after the union grievance was settled. There is simply no proof in the record that, of the Albuquerque MSTs, the women were treated any differently or less favorably than the men.

Plaintiffs cite no factual support to establish this fourth prong in their response or supplemental briefs. Plaintiffs' counsel argues that only the Santa Fe MST group, composed of men only, was left alone. This fact is supported by the Affidavit of Mr. Curtis, however the fact that one all male group is treated differently from a group of men and women does not satisfy the fourth prong either.

The Court concludes that Plaintiffs have not met their burden to establish a *prima facie* case of disparate treatment of gender discrimination.

### B. Disparate Impact

A disparate impact claim involves employment practices that are "fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). A disparate impact claim differs from a disparate treatment claim in that it does not require a showing of discriminatory intent. *See Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1242 (10th Cir. 1991). Instead, a plaintiff may establish a *prima facie* case of disparate impact discrimination by showing that a "specific identifiable employment practice or policy caused a significant disparate impact on a protected group." *Id.*; 42 U.S.C. § 2000e-2(k)(1)(A)(i). This *prima facie* case, in many respects, is more rigorous than in a disparate treatment case because a plaintiff must not merely show

circumstances raising an inference of discriminatory impact, but must demonstrate the discriminatory impact at issue. *See Bullington v. United Air Lines, Inc.*, 186 F.3d at 1312. If plaintiff establishes a *prima facie* case, the burden shifts to defendant to show that the challenged practice is job related and consistent with business necessity. 42 U.S.C. § 2000e-2(k)(1)(A)(i); *Ortega v. Safeway Stores, Inc.*, 943 F.2d at 1243-44. If defendant meets this burden, it is then up to the plaintiff to suggest an alternative employment practice that serves the employer's legitimate employment goals yet lacks the undesirable discriminatory effect. *Id.* at 1244.

As noted above, Plaintiffs lack a factual basis to show that female MSTs were treated differently from male MSTs. Similarly, Plaintiffs have not shown that they can demonstrate an inference of discriminatory impact, let alone an actual discriminatory impact. The only evidence before the Court is that the male MSTs in Albuquerque experienced the same treatment and impact as the female MSTs.

The Court concludes that Plaintiffs have not met their burden to establish a *prima facie* case of disparate impact of gender discrimination. Having established a *prima facie* case for neither disparate treatment nor disparate impact, Plaintiffs' gender discrimination claims shall be dismissed.

## V.  Race Discrimination

Plaintiffs Apodaca, Gonzales, Gonzales-Dunbar, and Marquez claim that PNM discriminated against them on the basis of race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. (Complaint at ¶ 52). Specifically, these Plaintiffs claim that the May 2000 elimination of the MST positions unfairly targeted and disproportionately impacted Hispanics. (*Id.* at ¶¶ 44, 53). Plaintiffs also claim that the Consolidation disproportionately impacted Hispanics, and was

15

undertaken in a discriminatory fashion towards Hispanics. (*Id*. at ¶ 44). Plaintiffs make no claims nor do they brief the issue of disparate treatment based on race.

Plaintiffs' argument in their brief on the topic of disparate impact is extremely brief. Relying on the same legal analysis applied to the age and gender section of their brief, Plaintiffs simply state: "Of the 14 MSTs, nine were Hispanic. ... the impact of the consolidation had a disproportionate effect on this protected category of workers." (Resp. at 19).

Disparate treatment based on race is analyzed under the same standards as those set forth above for gender discrimination.

PNM argues that the Consolidation was an isolated decision, as such does not constitute an "employment practice or policy", and therefore, the disparate impact theory does not apply to this case. Furthermore, PNM argues that 14 MSTs is a statistically insignificant number. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 996-97 (1988)(stating that statistical evidence may not be probative if it is based on a "small or incomplete data set").

Out of the 14 MSTs, nine (64.28%) were Hispanic and five (35.72%) were Anglo. As an illustration of the volatility of such a small number, I note that if two more of the MSTs had been Anglo, this would have resulted in seven Hispanics and seven Anglos, or a 50/50 impact.

For these reasons, the Court concludes that Plaintiffs have not met their *prima facie* burden of proof.

**WHEREFORE,** Defendant's motion for summary judgment is denied as to Plaintiffs' ERISA and ADEA claims, and granted as to Plaintiffs' claims of gender and race discrimination. Accordingly, Counts II and III of Plaintiffs' Complaint, claims for discrimination based on race and sex respectively, are hereby **dismissed**.

**IT IS SO ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**